## <u>CONTINUATION OF APPLICATION FOR A SEARCH WARRANT</u>

1.      I, John Fortunato, a Special Agent of the Federal Bureau of Investigation (FBI),

being duly sworn, depose and state as follows:

2.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been

so employed for approximately 17 years. I am currently assigned to the

Marquette Resident Agency in Marquette County, Michigan. In my

employment as an FBI Special Agent, I have investigated various types of

federal criminal violations, including violent crimes, computer crimes, as well

as national security investigations to include cases related to counterterrorism.

My training and experience have involved, among other things, interviewing

witnesses and confidential human sources, executing court-authorized search

warrants, conducting surveillance, and analyzing documentary, digital, and

physical evidence.  As a federal law enforcement officer, I am authorized to

investigate violations of federal law and to execute warrants issued under the

authority of the United States.  Through my training and experience, I am

familiar with the actions, habits, traits, methods, and terminology utilized by

criminal offenders.  My duties include the investigation of various violations of

federal criminal law, including matters involving violations of 18 U.S.C. §

1752(a) (Restricted Entry), 40 U.S.C. § 5104(e)(2) (Unlawful Activities on Capitol

Grounds), and 18 U.S.C. § 1512(c)(2) (Obstruction), which are collectively referred to in this affidavit as the "Subject Offenses."

3.    I make this Continuation of Application for a Search Warrant in support of a warrant to search the property and premises identified in Attachment A for the items and evidence identified in Attachment B.  As set forth below, there is probable cause to believe a search of the property and premises identified in Attachment A will reveal evidence of the Subject Offenses.

4.    This continuation is based on the investigation, observations, and/or experience of myself, FBI Special Agent Matthew Drummond, as well as other law enforcement officers. I have not included each and every fact known to me concerning this investigation. I have set forth the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be revealed during a search of the property and premises identified in Attachment A.

## BACKGROUND OF INVESTIGATION

5.    I am currently assigned to an investigation concerning violations of 18 U.S.C. § 1752(a), 40 U.S.C. § 5104(e)(2), and 18 U.S.C. § 1512(c)(2), which were committed on January 6, 2021, at the U.S. Capitol in Washington, D.C.

6.    18 U.S.C. § 1752(a) makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do so; (2) knowingly,

-2-

and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; (3) knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstruct or impede ingress or egress to or from any restricted building or grounds; or (4) knowingly engage in any act of physical violence against any person or property in any restricted building or grounds; or attempts or conspires to do so. For purposes of Section 1752 of Title 18, a restricted building includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

7.    40 U.S.C. § 5104(e)(2) makes it a crime for an individual or group of individuals to willfully and knowingly (A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House; (B) enter or remain in the gallery of either House of Congress in

violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House; (C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of— (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or (ii) the Library of Congress; (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; (E) obstruct, or impede passage through or within, the Grounds or any of the Capitol Buildings; (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings; or (G) parade, demonstrate, or picket in any of the Capitol Buildings.

8.   Finally, 18 U.S.C. § 1512(c)(2) makes it a crime to corruptly obstruct, influence, or impede any official proceeding, including a proceeding of Congress, or to attempt to do so.

## Events at the U.S. Capitol on January 6, 2021

9.     The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

10.    On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

11.    On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m.  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

12.    As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd

gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

13.     At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

14.     At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.  During the course of the forced entry and unlawful entry into the U.S. Capitol on January 6, 2021, participants in those offenses stole property from the U.S. Capitol, including as souvenirs, such as

name plates of members of Congress, documents belonging to members of
Congress, and similar items.

15.    Shortly thereafter, at approximately 2:20 p.m., members of the United States
House of Representatives and United States Senate, including the President of
the Senate, Vice President Mike Pence, were instructed to—and did—evacuate
the chambers. Accordingly, all proceedings of the United States Congress,
including the joint session, were effectively suspended until shortly after 8:00
p.m. the same day. In light of the dangerous circumstances caused by the
unlawful entry to the U.S. Capitol, including the danger posed by individuals
who had entered the U.S. Capitol without any security screening or weapons
check, Congressional proceedings could not resume until after every
unauthorized occupant had left the U.S. Capitol, and the building had been
confirmed secured.  The proceedings resumed at approximately 8:00 pm after
the building had been secured.  Vice President Pence remained in the United
States Capitol from the time he was evacuated from the Senate Chamber until
the session resumed.

16.    During national news coverage of the aforementioned events, video footage
which appeared to be captured on mobile devices of persons present on the

scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

17.     In this context, on January 7, 2021, the Federal Bureau of Investigation received a tip that KARL DRESCH, a resident of Calumet, Michigan, was at the U.S. Capitol Building the day before and had entered said building without permission or authorization.  The tip indicated that KARL DRESCH had posted information describing his own January 6, 2021, entry onto the U.S. Capitol Building on his Facebook account.  The tipster described the Facebook account, which included the username "Karl Dresch," and was available online at https://www.facebook.com/karl.dresch.7.

18.     I reviewed publicly available Facebook posts which were posted on the account (referred to here as the "FACEBOOK ACCOUNT") with username Karl Dresch and page located at https://www.facebook.com/karl.dresch.7.  Subsequently, on January 12, 2021, United States Magistrate Judge Robin Meriweather issued a search warrant concerning information associated with the FACEBOOK ACCOUNT.  Facebook, Inc., responded by providing information and records to the FBI on January 13, 2021.

19.     I have reviewed information and records from Facebook and found that, by no later than December 16, 2020, DRESCH posted information to the FACEBOOK account which was focused on the January 6, 2021, certification, and which

-8-

equated the planned events for January 6, 2021, with the historical events on
July 4, 1776.  For example, on December 16, 2020, DRESCH posted, "Stop the
Steal", and on December 20, 2020, DRESCH posted, "7-4-1776 = 1-6-2021".

20.    By January 3, 2021, DRESCH posted that he was preparing to go to "DC", and
was "prepared for chemical attacks and what not."  He also urged others to do
so by way of his FACEBOOK ACCOUNT, writing, "NO EXCUSES! NO
RETREAT! NO SURRENDER! TAKE THE STREETS! TAKE BACK OUR
COUNTRY! 1/6/2021=7/4/1776".  Between January 3, 2021, and January 6,
2021, other posts on DRESCH's FACEBOOK ACCOUNT reflect preparations to
arrange travel and then travel to Washington, D.C., for that purpose.

21.    On the FACEBOOK ACCOUNT, DRESCH posted photographs, such as the
photograph depicted in Figure 1, below, which show scenes from the U.S.
Capitol grounds on January 6, 2021.   The photograph in Figure 1 depicts a
group of individuals approaching the U.S. Capitol Building, which can be seen
in the background.  The background in the photograph, including the sky and
weather conditions as well as the depictions of the crowd, are generally
consistent with the depictions which I have seen from news accounts and other
reliable sources of photographs and videos of the scene on January 6, 2021. The
photograph, including the vantage point displayed in the photograph, is

consistent with a photograph taken by someone on the scene using a cellular telephone.

*Figure 1*



22.     Facebook records show that, at about 3:13 p.m. on January 6, 2021, DRESCH posted the photograph in Figure 2, together with the comment "Who's house? OUR HOUSE!"

*Figure 2*



23.    Facebook records show that, at about 3:14 p.m. on January 6, 2021, DRESCH

posted the photograph depicted in Figure 3.  This photograph was posted with

the title, "We are in."  I shared the post displaying Figure 3 with a U.S. Capitol

Police Officer, who confirmed that it accurately depicts the inside of the U.S.

Capitol Building, specifically, the "Crypt," a location under the rotunda in the

center of the Capitol.

24.    Facebook records also include metadata for the photograph in Figure 3.  The

metadata shows that this photograph was taken at 2:26 p.m., using a Motorola

"Moto e6" phone.

*Figure 3*



25.     In addition to these photographs, DRESCH also posted, or sent messages containing, videos of the scene inside and around the Capitol during the conduct under investigation.  For example, DRESCH posted the video depicted (in still frame), in Figure 4.  I provided Figure 4 to a member of the U.S. Capitol Police, who works in and is familiar with the U.S. Capitol Building.  He verified that the photograph in Figure 4 is an accurate depiction of the U.S. Capitol Visitor's Center, which is inside the U.S. Capitol and which was closed to the public on January 6, 2021.

*Figure 4*

-12-



26.     Facebook records do not specify the date or time that the video in Figure 4 was

taken.     However, at 12:11 a.m. on January 7, 2021, shortly after midnight,

DRESCH  posted  the  video  with  the  comment,  "Okay  all  you  conspiracy

theorists [winking smiley face emoji] don't worry I loves yous all just setting

the  record  straight.antifa  did  not  take  the  capitol.that  was  Patriots,  I  can't

guarantee there weren't some shit birds in the crowd but what multi-million

crowd can you guarantee?.don't give them the thunder, we the people took

back our house, the news is all bullshit.and now those traitors Know who's

really in charge. And I can't say I saw any violence from our people, despite all

the poking of the capitol police, gassing randomly into the women and children being peaceful, beating old men we kept chill[.]"

27.    While inside the Capitol, DRESCH also exchanged messages with other Facebook users.  On January 6, 2021, at about 2:43 pm on, prior to posting Figures 2 and 3, DRESCH exchanged messages with another Facebook user, referred to here as "USER TWO."  At 2:43 p.m., USER TWO wrote, "Patriots are

in the Capitol building now."  DRESCH responded at 2:44 p.m., writing "I am,"

and, also sent the photograph depicted in Figure 5.

*Figure 5*



28.    Figure 5 is cropped to ensure that it fits on the page, but the rest of the

photograph depicts only the floor.  A complete copy of the photograph was

provided to a member of the U.S. Capitol Police, who stated that the photo

appeared to depict inside the Capitol Visitors Center, and that it appears to

show the part of the Visitor's Center that is closer to the House of Representatives.

29.     USER TWO wrote, at 2:48 p.m., that "Word is police are getting ready to use tear gas."  DRESCH responded, "Been using it.  Mask up."

30.     DRESCH also corresponded with a Facebook user referred to here as "USER THREE."   According to Facebook records, at 5:17 p.m., DRESCH sent USER THREE a "selfie" or self-portrait photograph, together with the message, "Just had a beer on our front porch."  Figure 6 is a copy of that "selfie" photograph, which shows DRESCH outside of the Capitol Building.

*Figure 6*



31.  A minute later, at about 5:18 p.m., DRESCH sent USER THREE the same photograph depicted above in Figure 3, together with the comment, "That's right outside the house of representative...we got in! Took a lil gas ...wtf I love masks now!"

32.  DRESCH provided additional context about the scene, writing to USER THREE, "Had the cops booking it."  He did not explain further or provide photographs depicting that.

33.  DRESCH also responded to other people's comments on Facebook.  For example, at about 4:46 p.m., in response to another post, DRESCH wrote, "It was peaceful...still got a lil gas tho...mask on for safety[.]"  In response to another person who wrote about the individuals breaking into the Senate and House chambers and breaking glass and shoving officers, at around 6:09 p.m., DRESCH wrote "we broke no glass no shoving I seen[.]"

34.  Later that evening, DRESCH expressed his approval of the events of the day.  At about 8:32 p.m., commenting on a picture of a crowd at the Washington Monument, DRESCH posted, "Total Victory!"  At 8:44 p.m., DRESCH posted, "I'm excited!"  The next day, on January 7, 2021, at about 9:36 a.m., DRESCH commented on an unidentified post that "Mike Pence gave our country to the communist hordes, traitor scum like the rest of them, we have your back give the word and we will be back even stronger."  The underlying post belonged to

another Facebook user, and Facebook's production of information and records here did not include a copy of that post or identify its user.

35.   Finally, on January 8, 2021, around 11:35 a.m., DRESCH sent another user the photograph depicted in Figure 7.  Facebook records do not include the date or time the photograph was taken.  However, I provided a copy of the photograph to a member of the U.S. Capitol Police, who stated that the photograph was taken in the Crypt of the U.S. Capitol, the same location as Figure 3, and that it showed the statute of John Caldwell Calhoun.   In addition, I reviewed the photograph closely and compared it with the "selfie" photograph in Figure 6.  I noticed that the person pictured in both photographs appears to be wearing the same distinctive clothing – a jacket or blazer-style jacket and a plaid multicolor shirt with some reddish coloring, over a hooded sweatshirt, and a baseball-style cap.  The photograph for Figure 7, which depicts more of the subject's body, also shows that the subject was wearing dark-colored pants or jeans, black gloves, and reflective sunglasses, and carrying large flags.

*Figure 7*



36.    On January 7, 2021, I obtained a copy of DRESCH's Michigan Driver's License

picture and compared it to the profile pictures for the FACEBOOK ACCOUNT,

as well as the "selfie" depicted in Figure 6.   Figure 8, below, contains the

Driver's License picture and the Facebook profile picture.   The Michigan Driver's License picture is on the left side of Figure 8; the Facebook profile picture is on the right side of Figure 8.  Based on the comparison between those two pictures, I believe that there is probable cause to believe that both pictures depict DRESCH.   I further believe, based on a comparison of those pictures with Figure 6 and Figure 7, as well as the other evidence described above (including the description of clothing), that there is probable cause to believe that all of these pictures depict DRESCH.

*Figure 8*



37.     Finally, Facebook records show that the FACEBOOK ACCOUNT is associated with a mobile telephone number, +1-906-231-1623.   The FACEBOOK ACCOUNT was frequently accessed from IP addresses that, according to publicly available WHOIS records, are registered to Verizon Wireless and its affiliates.  In addition, a search of law enforcement databases, which in my training and experience are reliable sources of this type of information, also show that +1-906-231-1623 was serviced by Verizon Wireless and its affiliates.

38.     Based on all of the foregoing information, as well as my training and experience, I respectfully submit that there is probable cause to believe that DRESCH committed Subject Offenses that are under investigation, including by unlawfully entering in and remaining in the U.S. Capitol on January 6, 2021.  In addition, based on the evidence above, including the video and images above, I submit that there is probable cause to believe that DRESCH used a Motorola Moto e6 cellphone to record the video and images described above, and to post, or publish, the video, images, and writings described above on social media accounts.  I further submit that there is probable cause to believe that DRESCH uses a cellular phone with the telephone number +1-906-231-1623.   The telephone number +1-906-231-1623 may be associated with the Motorola Moto telephone, or DRESCH may have more than one telephone.

-21-

39.     In addition, I also know that subjects can post on social media, or communicate using social media or e-mail, or similar internet-connected system, using computers or other Internet-capable devices, such as cellular telephones and tablets, which are typically stored at subjects' homes.   In this affidavit, I collectively refer to those items generally as "Computer Devices."

40.     I further submit that there is probable cause to believe that DRESCH possessed clothes and other items which he wore or carried January 6, 2021, including as depicted in Figures 6 and 7, and that these items constitute evidence concerning the Subject Offenses described in this Affidavit.   These items include a jacket or blazer-style jacket and a plaid multicolor shirt with some reddish coloring, a hooded sweatshirt, a baseball-style cap, dark-colored pants or jeans, black gloves, reflective sunglasses, and large flags.

41.     The FBI has conducted surveillance of DRESCH's residence, which is the premises located at 57629 Waterworks Street, Calumet, Michigan, as further described in Attachment A.   On January 19, 2021, law enforcement observed DRESCH at the premises described in Attachment A.   DRESCH appears to live with his wife at the premises.

42.     Shortly after observing DRESCH at the residence, on January 19, 2021, law enforcement arrested DRESCH outside the residence, while DRESCH was in the motor vehicle pictured below.  The motor vehicle was a white Toyota Camry

with license plate DDN 301 and Vehicle Identification Number ("VIN")

JTDBE32K520107042:



43.     In connection with the arrest of DRESCH, law enforcement seized a cellphone

from DRESCH.  The cellphone is a black in color Motorola cellphone.  The

cellphone is currently in "airplane mode," which means that it will not receive

signals, and as a result the phone number associated with the cellphone has not

been determined.  In addition, the exterior of the seized cellphone does not

identify its model, and as a result it has not been confirmed whether the seized

cellphone is a Motorola Moto e6.  The cellphone is currently in the possession

of the FBI at the Calumet Michigan State Police Post located at 55195 US-41, Calumet, MI 49913.

44.    Based on the foregoing, as well as the additional technical information below, I respectfully  further submit that there is probable cause to search the property and premises described in Attachment A, for the items described in Attachment B, and that said items will constitute and contain evidence of the Subject Offenses.

### TECHNICAL TERMS

45.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving,

Case 2:21-mj-00002-MV   ECF No. 4-1,  PageID.74   Filed 01/19/21   Page 25 of 32

and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media

player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often  records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least

four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the

screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP

-28-

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    i.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

46.    Based on my training, experience, I know that the Target Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

47.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time

on the device.  This information can sometimes be recovered with forensics tools.

48.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how a device (including the Target Device) was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on such a device (including the Target Device) because:

   j.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   k.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   l.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context,

be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

m. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

n. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

49. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device

to human inspection in order to determine whether it is evidence described by the warrant.

## **CONCLUSION**

50.     Based on the above factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of criminal offenses in violation of 18 U.S.C. § 1752(a) (Restricted Entry), 40 U.S.C. § 5104(e)(2) (Unlawful Activities on Capitol Grounds), and 18 U.S.C. § 1512(c)(2) (Obstruction) may be found on the property and premises identified in Attachment A.

51.     I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items and evidence identified in Attachment B.